DEVELOPMENT BANK OF AMERICAN SAMOA, Plaintiff,

v.

TUIKA TUIKA and MAFA TUIKA, Defendants.

High Court of American Samoa
Trial Division

CA No. 106-01

April 11, 2003

Before RICHMOND, Associate Justice, LOGOAI, Chief Associate Judge, and MAMEA, Associate Judge.
Counsel: For Plaintiff, David P. Vargas
        For Defendants, David Wagner

OPINION AND ORDER

Plaintiff Development Bank of American Samoa ("DBAS") filed this action to collect on the promissory note executed by defendants Tuika Tuika and Mafa Tuika (together "the Tuikas") and to foreclose on the real estate mortgage securing the note. Trial was held on July 18, 2002. DBAS's collection supervisor, the Tuikas and both counsel were present.

The Tuikas vigorously contested the amount owed, and the parties presented relatively complex and voluminous accounting evidence on the issue. Accordingly, we scheduled written closing arguments, directing counsel to include schedules of the parties' respective analysis of the loan disbursements, interest calculations, and repayments to assist the Court's evaluation of the evidence. This process was completed on August 30, 2002. Meanwhile, on August 15, 2002, the Tuikas filed a motion to declare a mistrial and afford them more time to engage another attorney to represent them. They claimed that their present counsel misplaced or failed to present material evidence supporting their contentions. This motion was heard and taken under advisement on September 16, 2002. Three days later, on September 19, 2002, the Tuikas terminated their counsel's representation. We advised counsel at the September 19 hearing that we would consider the post-trial documentation the Tuikas attached to their motion, along with the schedules counsel attached to their written arguments, as part of our effort to correctly determine the amount, if any, the Tuikas owed to DBAS.

We have taken a seemingly inordinate period of time to decide this case. So much time has passed that, on February 7, 2003, with the Court's permission, DBAS's new in-house counsel, Fainu`ulelei F. Ala`ilima-Utu, took over DBAS's representation. However, we purposely took this considerable time period to painstakingly analyze the accounting evidence and fully evaluate the Tuikas' request for a mistrial.

## Discussion

### I. Amount Owed

On November 13, 1990, the parties entered a loan agreement, under which the Tuikas borrowed $100,000 from DBAS for the purpose of "improving existing business." The agreement provided for repayment installments of $1,377.96 for a period of 120 months or until the

principal and interest was paid in full. The loan interest, calculated daily on the unpaid principal balance on the basis of a 360-day year, was the lesser of the lawful maximum rate (18% for business loans under A.S.C.A. § 28.1503) or the prime rate as published from time to time in the *Wall Street Journal,* plus one percent. The installments were payable on the first day of each month, beginning on December 1, 1990.

On the same date, November 13, 1990, the Tuikas executed a promissory note to DBAS reflecting the terms of the loan agreement. Collection of the amount owed under this note is DBAS's principal goal by this action. The Tuikas also executed, to secure the loan, a real estate mortgage on approximately 0.6596 of an acre of land in Ili`ili, American Samoa, and a chattel mortgage on specified furniture, fixtures, and equipment. The loan was made for the Tuikas' business operations on or from the mortgaged land. Foreclosure of the mortgage is DBAS's second objective.

We are persuaded by a preponderance of the evidence that the schedule Exhibit "B" attached to DBAS's closing argument is the correct calculation of the amount the Tuikas owe on the note as of July 1, 2002. That amount is $38,043.68.

The Exhibit "B" schedule accounts for all disbursements of the loan proceeds, and all payments by the Tuikas up to and including their last payment on November 7, 1997. The payments embrace the Tuikas' first six payments of $1,500, shown only by the copies of the Tuikas' Loan Payment Book, which were attached to their post-trial motion of August 11, 2002. DBAS's records do not show these payments, but the Court accepted the late submission of the Loan Payment Book to fully and fairly assessed all evidence pertaining to the full history of the loan.

For the interest calculations, the formula based on the prime rate plus one per cent has been applicable throughout the existence of the loan. The Exhibit "B" schedule also correctly reflects the prime rate in effect at the beginning of the loan on November 13, 1990, and all changes in the prime rate in effect after that date up to July 1, 2002. The total amount due as of July 1, 2002, as shown in the schedule, includes accurate interest calculations based on the prime rate applicable from time to time.

## II. Defenses

Apart from their accounting calculations, which the Court has determined to be incorrect, the Tuikas presented defenses without substance.

First, and foremost, the Tuikas argue that DBAS was in wholesale and deliberate breach of the loan agreement by not timely adjusting the interest rate with each change in the prime rate, thus excusing them from further repayment of the loan. DBAS can certainly be faulted with poor loan administration. Clearly, DBAS had no adequate system in place to monitor the prime rate changes and routinely adjust the interest rate with each change. DBAS's failure to properly administer the loan was not deliberate. Lack of trained personnel to adequately attend to this kind of loan program was at the root of the problem. It was not a matter of intentional conduct, but one of simple oversight. The Tuikas, however, are not excused from repaying the loan based on DBAS's mishandling of the now-corrected interest adjustments.

Next, Tuika Tuika raised the ogre of misconduct by DBAS personnel and improper motivations based on his personal conflicts with DBAS staff members. These problems apparently date from the era when Tuika Tuika himself was a member of the DBAS staff, the same time during which the Tuikas obtained the loan. Since then, problems have surfaced from time to time and underscored his stormy relationship with DBAS personnel. In any event, the Tuikas have not shown any relevant relationship between these problems and the present loan collection issue. Again, they are not excused from repaying the loan by this state of affairs.

Finally, in order to either reduce the Tuikas' liability or excuse further payment, Tuika Tuika, while testifying, alluded to a U.S. Government policy limiting the loan interest to 4% per annum. His reference, however, was vague, without citation to any concrete authority for the existence of the federal policy or its applicability to this loan.

The bottom line is simply that the Tuikas entered a binding loan agreement with DBAS and must fulfill their obligations under that agreement.

## III. Mistrial Motion

The Tuikas' motion for a mistrial is a misnomer. Mistrials typically apply to jury trials, and are granted when something has occurred that seriously infringes on a party's rights or when the jury is deadlocked. Because all civil cases in American Samoa are bench trials, we have no mechanism or rule that envisions a motion for a mistrial. Therefore, we will treat the motion as one for a new trial. *See* A.S.C.A. § 43.0802; T.C.R.C.P. 59. Logically, since this is the judgment, the motion was filed before a judgment was ever entered. This sequence, however, is of no moment. "A motion for a new trial shall be filed *within* 10 days after the announcement of the judgment or sentence." A.S.C.A. § 43.0802 (emphasis added). In this context, we interpret the

word "within" to include "only the final limit and not the starting point." *Young v. Waldrop*, 109 P.2d 59, 60 (Mont. 1941).[1]

■ Such a result is consistent with the language of T.C.R.C.P. 59(a), which, upon a motion for a new trial, allows the court to "open the judgment *if one has been entered*." (Emphasis added).[2] If prejudgment motions for new trials were not allowed, the rule would not need to address specifically situations where a judgment had been entered. Therefore, though a motion for a new trial may be made *no later* than 10 days *after* the judgment, *see, e.g., Fetalaiga v. Fuimaono*, 21 A.S.R.2d 12, 13 (App. Div. 1992), it may also be made *before* the judgment. *See Dunn v. Truck World, Inc.*, 929 F.2d 311 (7th Cir. 1991) (allowing motion for new trial before judgment entered under Fed. R. Civ. P. 59).

■ The real consequence of prejudgment motions for a new trial is that they might create ambiguities as to whether or not the motions have been granted or denied. The Seventh Circuit, for example, has held that under the Federal Rules of Civil Procedure, "When a party files a prejudgment motion for a new trial, the judgment itself is the order 'denying a new trial.'" *Dunn*, 929 F.2d at 313. On the other hand, the Fourth Circuit has held that a district court must be explicit in granting or denying a prejudgment motion for new trial. *Havird Oil Co., Inc. v. Marathon Oil Co., Inc.*, 149 F.3d 283, 289 (4th Cir. 1998) (rejecting *Dunn* and basing its decision on Fed. R. Civ. P. 50, which is not applicable in American Samoa). We think the Fourth Circuit's approach is wise. At the very least, when issuing a judgment, a trial court in American Samoa should explicitly state its disposition of a prejudgment new trial motion, even if it does not explain its reasons.

We have complied with A.S.C.A. § 43.0802 and accepted the Tuikas' prejudgment motion as one for new trial. In so doing, we have allowed additional evidence into the record. *See* T.C.R.C.P. 59 (court may "take additional testimony"). Thus, the Tuikas' motion was not in vain.

---

[1] T.C.R.C.P. 59(b), which states, "A motion for a new trial shall be served not later than 10 days before the date of the hearing," speaks only to when the motion must be served and not with when it shall be made.
[2] T.C.R.C.P. 59(a) provides in full:
> (a) Grounds. A new trial may be granted to all or any of the parties and on all or part of the issues for any of the reasons for which rehearings have heretofore been granted in suits in equity. On a motion for a new trial the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

However, for the reasons stated, this judgment should be taken as denying their motion for a (mistrial) new trial.

## Order

1. The Tuikas motion for a (mistrial) new trial is denied.

2. DBAS shall recover from the Tuikas, and the Tuikas shall pay to DBAS, the sum of $38,043.68, plus interest on the balance of the unpaid principal amount as of July 1, 2002, from that date to the entry date of this judgment, using the prime rate in effect from time to time plus one per cent per annum as the basis of the interest calculations (or the maximum lawful interest rate if the prime rate plus one per cent ever exceeds the maximum rate),[3] reasonable attorney's fees,[4] and court costs. The Tuikas shall also pay interest at the rate of 6% per annum on the total amount of the judgment, including interest accruing from the July 1, 2002, to the entry date of this judgment and court costs, from the entry date of this judgment until the judgment is paid in full.

3. The mortgage is foreclosed. The premises shall be sold according to applicable law.

It is so ordered.

---

[3] The Court notes that paragraph 3 of the promissory note provides, in essence, that upon default in the payment of any principal and interest when due, the interest rate increases to the prime rate in effect from time to time plus three per cent per annum (not to exceed the maximum allowable rate). The loan agreement, however, does not contain a similar provision. The Court construes this inconsistency in the Tuikas' favor and against DBAS for purposes of the calculated amount of the interest to be included in the judgment.

[4] Paragraph 7(a) of the loan agreement and paragraph 4 of the promissory note provide, in substance, that the Tuikas shall pay reasonable attorney's fees incurred in the collection of their debt to DBAS. The Court shall determine the amount of attorney's fees based upon an affidavit of DBAS's counsel and, if contested, an evidentiary hearing on the issue.